GEORGE J. GERHART, Appellant, v. CITY OF ST. LOUIS; HENRY KIEL, Mayor; MAX C. STARKLOFF, Health Commissioner, and ANTON SCHULER, City Marshal, of City of St. Louis.

Division One, March 16, 1925.

1. **ORDINANCE: Killing Impounded Dog: Validity.** An ordinance requiring an officer of the city to take up and impound in a suitable place any dog found in the city without a collar or running at large unmuzzled, and giving to the owner three days in which to redeem an impounded dog, is valid. And likewise an ordinance authorizing the pound-keeper to deliver to an approved medical college, upon application, such a number of impounded dogs as in the opinion of the health commissioner are reasonably needed to teach and maintain the different courses of medical study therein, is valid. The The two ordinances when read together mean that an impounded dog cannot be killed or turned over to a medical college until the three days in which he may be redeemed have expired.

2. ———: ———: **Remedy: Equity: Action at Law.** Domestic dogs are property in Missouri, and no one has a right to kill them except for just cause. So that where the ordinance provided that an impounded dog might be killed or delivered to a medical college if not redeemed within three days, and the owner has complied with all ordinance conditions for the dog's redemption, his remedy is not by injunction to prevent the enforcement of the ordinance or to have it declared invalid, but by an action at law—by a suit in replevin or trover, if the dog has not been killed, and by an action for damages if killed. An action at law being a complete remedy, a suit in equity is not appropriate.

3. **APPELLATE JURISDICTION: Suit Against City of St. Louis.** The Supreme Court has appellate jurisdiction of a suit to which the city of St. Louis is a party, whether or not constitutional questions have been injected into the case.

Citations to Headnotes: 1, Municipal Corporations, 28 Cyc. 741; 2, Animals, 3 C. J. 4; Injunctions, 32 C. J. 415; 3, Courts, 15 C. J. 511.

Appeal from St. Louis City Circuit Court.—*Hon. Robert W. Hall,* Judge.

AFFIRMED.

*Raymond S. Davis* for appellant.

(1) Ordinance 31698 is unconstitutional and void because it deprives plaintiff of his property without due process of law and does not permit plaintiff to redeem his dog. Dillon on Municipal Corp. sec. 620. (2) Ordinance 31698 is unconstitutional and void because it permits one class of persons only to purchase dogs from the city at a certain price, and because it further permits only a certain class of medical schools to purchase dogs. State v. Loomis, 115 Mo. 307; State v. Miksicek, 225 Mo. 561. (3) Ordinance 31698 creates a contract by the city through its Board of Aldermen to sell dogs to medical schools for seventy-five cents each, and authorizes the Health Commissioner to contract for the sale of dogs and is therefore illegal and void. State v. Butler, 178 Mo. 272. (4) Ordinance 31698 provides for the doing of a public work at a fixed sum without advertising for bids, and is therefore illegal and void. State v. Butler, 178 Mo. 272. (5) Ordinance 31698 requires a public officer to perform a service for particular persons, which he is not required to perform for all citizens alike, and is therefore illegal and void. (6) Ordinance 31698 conflicts with Section 585 of the Municipal Code, and does not repeal or amend or purport to repeal or amend said Section 585, and is, therefore, illegal and void. 25 R. C.

L. pp. 872, 874, secs. 117, 119; Best v. Broadhead, 108 Pac. 333; Rocho v. Boone Electric Co., 140 N. W. 193; St. Louis v. Sanguinet, 49 Mo. 581; LeMeine v. St. Louis, 72 Mo. 404. (7) Plaintiff as a taxpayer is entitled to maintain this suit to prevent the city from diverting public funds or public property. High on Injunctions (4 Ed.) 1313, sec. 1298; Hitchcock v. St. Louis, 49 Mo. 484; Stocke v. Edwards, 244 S. W. 802. (8) Plaintiff is entitled to maintain this action for himself and all others similarly situated to prevent a multiplicity of suits. Coal Co. v. St. Louis, 130 Mo. 323; Hays v. Poplar Bluff, 263 Mo. 516; Jewel Tea Co. v. Carthage, 257 Mo. 383. (9) Plaintiff has no adequate remedy at law and is therefore entitled to maintain this action. Jacobs v. Cauthorn, 238 S. W. 443.

*Oliver Senti, Arthur H. Bader* and *Michael J. Hart* for respondents; *Frederick W. Lehmann* and *Irvin V. Barth* of counsel.

(1) The petition is without equity as the plaintiff has an appropriate and adequate remedy at law. (2) The plaintiff's bill was properly dismissed by the trial court: (a) Because the case is moot. The dog being dead, there was nothing upon which the injunctive process of the court could act. State ex rel. Ashton v. Imel, 243 Mo. 178; Atherton Mills v. Johnston, 259 U. S. 13; Mills v. Green, 159 U. S. 651; Codlin v. Kohlhausen, 181 U. S. 151; Tenn. v. Condon, 189 U. S. 64; Jones v. Montague, 194 U. S. 147; Hicks v. St. Louis, 234 Mo. 647. (b) Because there is no equity in the bill: first, since plaintiff has an adequate remedy at law. He had an action in tort against Dieckman, replevin prior to the killing of the dog, conversion thereafter. 7 McQuillin on Municipal Corporations, p. 6763, sec. 536, note 48; Burton Machinery Co. v. Ruth, 194 Mo. App. 194; Steadly v. Stuckey, 113 Mo. App. 582; State ex rel. v. Adams, 110 Mo. App. 468; Kansas City ex rel. v. Minor, 89 Mo. App.

617. Second, since a multiplicity of suits as the asserted basis of equitable intervention is wholly groundless. In appearing for others "similarly" situated, it is, of course, a prerequisite that plaintiff himself have property interests affected by the ordinance which is the subject of the injunction. Here plaintiff has no property interests in a live dog subject to be disposed of under the terms of the ordinance, nor, indeed, does the ordinance itself in any wise apply. Cases supra. Third, since the evidence discloses a collusive attempt on the part of plaintiff and Dieckman to violate Section 585 of the Municipal Code in the hope of testing Ordinance No. 31698. "He who comes into equity must come with clean hands." Creamer v. Bivert, 214 Mo. 473, 485; Peltzer v. Gilbert, 260 Mo. 500, 524. (3) In any event Ordinance No. 31698 is constitutional. It constitutes a valid exercise of the police power. Blair v. Forehand, 100 Mass. 136, 97 Am. Dec. 82; Sentell v. New Orleans, 166 U. S. 701; City of Carthage v. Rhodes, 101 Mo. 175. Statutes and ordinances *in pari materia* must be construed together and their consistency respected. Ruschenberg v. Southern Electric Ry. Co., 161 Mo. 70; Sedalia v. Smith, 206 Mo. 363; State v. Clark, 54 Mo. 216; 2 Lewis's Sutherland on Statutory Construction, pp. 844-853, par. 448 (Vol. 1, 8 Ed. par. 82).

GRAVES, J.—This is a dog case. The city of St. Louis has three ordinances which deal with the general welfare of the dogs of the city. Perhaps it would be better to say which deal with the general welfare of the public. The record bears some evidence of the fact that it is a made case, and the real question is whether or not it has sufficient evidence of good faith, and if so, has it sufficient of facts to pass muster. The appellant sought to enjoin the city and its officials from enforcing Ordinance No. 31698 of the city of St. Louis. This ordinance is short, and the only two sections thereof read:

"Section One. Whenever any school of medicine, in the city of St. Louis, which is recognized and approved

307 Mo. Sup.—14.

by the Board of Health of the State of Missouri, shall apply to the Health Commissioner for an order to the City Marshal directing him to deliver to such school of medicine a certain number of dogs held and impounded by him and which are reasonably needed by it to teach and maintain the different courses of and for the study of medicine, the Health Commissioner, upon being satisfied as to the standing of said school of medicine, and that the number of dogs requested are reasonably needed by it to teach and maintain its courses of and for the study of medicine, shall make an order to the City Marshal directing him to deliver the said dogs to the said school of medicine.

"Section Two. It shall be the duty of the City Marshal to deliver the said dogs to the said school of medicine as directed by the Health Commissioner, and he shall collect a fee of seventy-five cents per head for the dogs delivered, to cover the expense of taking up and caring for said dogs."

The ordinance became effective on May 19, 1922. It was violently opposed by the Humane Society of the city. The Revised Code of the city of St. Louis contains two sections (583 and 585) which deal with the subject of dogs. Section 583 reads:

"It shall be the duty of the city marshal and his deputies and assistants to take up and impound in a suitable place—of the location of which he shall give notice by posting a card or notice in some conspicuous place in his office, and by posting a similar card or notice in the office of the license collector—any dog found in the city of St. Louis without a collar around its neck, marked as herein provided, or which may be found running or being at large unmuzzled, contrary to the provisions of any order issued by the health commissioner as provided by ordinance, shall be impounded."

Section 585 provides the method of the redemption of impounded dogs. It gives the owner three days time to redeem his impounded dog, and if not redeemed in such time authority is given the officers to kill the same. This

section provides the details for the redemption. These sections are found in the Revision of 1914 of the general ordinance of the city of St. Louis.

Geo. F. Dieckman was made pound-master by the appointment of Anton Schuler, the city marshal of St. Louis. Dieckman was also an officer of the Humane Society, as is the Hon. Douglas W. Robert, the latter being the President thereof. On the morning of June 14, 1922, a dog of the appellant was taken up by men working under Dieckman. Appellant immediately telephoned Robert the predicament of his dog, and requested him to take such action as would release the prisoner. Mr. Robert sent a man post-haste for the necessary documents and tags to procure the release, and before noon of that day he tendered the same, with the necessary cash, to Dieckman for the release of the canine—a black-and-tan of no proven value, but one close to the heart (as is alleged) of appellant. Dieckman refused, as is said, because he had an order for ten dogs under the ordinance first set out, from the Washington University. Thereupon Mr. Robert, with the necessary papers in his pocket, had Gerhart, the plaintiff (now appellant) sign up, and he immediately filed this suit in equity, by which it is sought to enjoin the respondents from enforcing said Ordinance No. 31698, supra. On the same day the circuit court granted an order upon defendants to show cause on June 22, 1922, why a temporary injunction should not be granted. Dieckman was not a party to the action, but the City Marshal, Schuler, was, as will be seen by the title of this cause. The University did not get the dog, and as the pound-master had a killing of dogs each Tuesday and Saturday, the record would indicate that plaintiff's dog took his departure to the great beyond on Saturday, the 17th of June. After the injunction suit was filed, the plaintiff seems to have lost all interest in his dog, but retained his interest in the lawsuit. Dieckman says he gave directions to his men on the 14th not to kill the dog, but very singularly he cannot account for his later absence. As said, the dog probably met the usual fate at the killing upon the

17th. The evidence discloses that Dieckman usually kept the well-bred dogs overtime, in the hope of some person taking them out. Neither plaintiff nor Dieckman seems to have had any interest in this dog, after they got the injunction suit filed. The petition for injunction charged the unconstitutionality of this ordinance (No. 31698) from all imaginable angles, and it is averred that the suit was brought by plaintiff, as a taxpayer, in behalf of himself, and all others similarly situated. No others seem to have been interested. After the evident demise of the dog, the trial court heard evidence on the matter of granting a temporary injunction, but after this hearing the issues were fully made up, and by agreement the case submitted for final determination on the evidence adduced on this hearing. There was no hurry, as the dog was dead. Later the court denied the permanent injunction and dismissed plaintiff's bill. From such judgment, this appeal was taken. There was full answer to the bill made by respondents, which can be noticed in the course of the opinion, if necessary. The city is a party and this suffices for our jurisdiction of the case, without considering the sundry alleged constitutional questions. There are enough of these to suffice for the appeal of a dozen cases, if they are of substance.

I.   Perhaps it would be better to give a slight outline of respondents' answer and contentions. They admit the official position of Dieckman at the time of the disappearance of plaintiff's "black-and-tan" dog, alleged to have been close to the heart and affections of the plaintiff. "Black-and-Tan" seems to have Moot Case. taken his departure about June 17th, and respondents say that Dieckman was deposed (officially) on the 19th, the Monday following. They charge that Dieckman violated the ordinances of the city, in refusing to return the dog to his distressed (?) master; that they were not parties to the performance, and that the bill in equity was a cooked-up case to trouble them and the learned chancellor *nisi*. They intimate that plaintiff had

no real affection for ''Black-and-Tan,'' but that the case was one ''cooked'' up by Dieckman and his Humane Society, in order, *willy-nilly,* to draw into equity Ordinance No. 31698, supra. In fact Dieckman testified that he had to have a test case, so plaintiff's canine was selected for the purpose. Respondents also say that the demise of ''Black-and-Tan'' makes the case a moot one, as appellant may never have another such to be threatened with laboratory work at Washington University. They say that plaintiff has ample remedy at law, and there was no reason to ''fudge'' upon a court of equity. To say the least, there are suspicious circumstances, and the trial court (judging from the questions asked by the court) dobted the *bona fides* of the equitable action. He seemed to be impressed with the idea that all affection for ''Black-and-Tan'' had disappeared, when once the attack in equity had been safely launched. Brother Dieckman (the Humane Society secretary and pound-master) did nothing for ''Black-and-Tan'' except to tell his men not to kill him, yet he was never heard of after the dog executions at the city pound on the 17th. Dieckman succeeded, however, in getting his personal attorney, who was also the president and general counsel for the Humane Society, to hurry up an equitable attack upon the ordinance that he (Dieckman) had vigorously opposed before its final passage. The learned chancellor no doubt recalled the story of ''Old Drum'', the veteran hound dog of Johnson County. He no doubt thought of how Burden, the owner of ''Old Drum,'' searched the country wide, until he found the corpse, and after satisfying himself of the author of his wrong, proceeded to sue Hornsby for the value of his dog. He finally recovered after two trials in the justice's court, two in the common pleas court, and one in this court. [Charles Burden v. Leonidas Hornsby, 50 Mo. 238.] It was in this case that Senator George G. Vest delivered his famous eulogy upon the dog. See ''The True Story of 'Old Drum' '' by Walter L. Chaney, republished in Missouri Historical Review, in January number, 1925, being Vol. XIX, No.

2, of that publication, at page 313, in which story appears the tribute of Senator Vest to man's most steadfast friend, the dog. The learned chancellor no doubt thought of plaintiff's great lack of interest in his beloved (?) "Black-and-Tan" after the equity proceeding was safely launched. If he had the knack of reading between lines (and we think that he did) he no doubt concluded that "Black-and-Tan" was not a dog troubled with undue affection from his master, but a mere "critter" to be made the "goat" for launching this bill in equity. If the learned chancellor so concluded, his views meet with just what is in our mind, after reading this record. There were no tears for "Black-and-Tan" as for "Old Drum." Thought of him ceased, when he had served his part in the institution of this suit in equity. Whither he went no man seems to know, nor did they seem to care. And this includes the distressed (?) master, who never inquired for his dog after he lodged this suit. "Black-and-Tan," although saved, by injunction, from the laboratories of Washington University, was left friendless and alone to suffer the cruelties of the several dog-catchers under Dieckman, and under the ordinances of the city, after the lapse of three days, took his final departure, unwept, unhonored, unmourned and unsung. Peace to his ashes.

II. With a heavy heart we proceed to the law of "Black-and-Tan's" case. He is left with us in equity, his spirit wandering, where we know not. It is true that equity does hover over and around the widow, the orphan, the minor, and the *non compos*, but neither "Black-and-Tan" nor his owner falls within either of these classes, under the evidence adduced. Neither are of the special charges of a court of equity.

Valid Ordinances.

We shall not elaborate upon the law of this case. It is clear that the new ordinance with reference to the delivery of dogs does not repeal the two sections of the code which we have mentioned. All can stand under a

proper construction. We mean all can stand on the theory that all are valid. The first two sections are not questioned and could not be questioned. The late ordinance (the one questioned here) thoroughly fits into the system. After the lapse of three days the evidence shows a great number of dogs, whose lives have been forfeited to the city. The new ordinance means, that of these, the pound-master should select those for medical schools. It does not mean that the new-comer into the pound shall be turned over to meet the requirements of this new ordinance. The dog has three days for redemption, before he can either be killed by the executioner of the pound-master, or be delivered to a medical school. Such is the clear meaning of these ordinances when read together.

We shall not discuss the alleged invalidity of the new ordinance, for reasons made apparent by the succeeding paragraph. That ordinance has been dragged into this case by the ears. We might say almost by force and arms.

III. The plaintiff in this case had an adequate and complete remedy at law. When we began the practice of law, our first case was a dog case, and we were as proud as the small boy with his first pair of red-topped boots, when we recovered for our client the sum of $50 for a dog. (pure-bred Collie) which had been shot by a neighbor. We have kept in touch with the dog law ever since. Dogs are property in Missouri. "It has long been the settled law that dogs are property in Missouri and that no one has the right to kill them except for just cause." [Reed v. Goldneck, 112 Mo. App. l. c. 312.] To like effect are Fenton v. Bisel, 80 Mo. App. l. c. 138; Woolsy v. Hass, 65 Mo. App. l. c. 199, bottom of page; State v. Mease, 69 Mo. App. l. c. 582; Gillum v. Sisson, 53 Mo. App. l. c. 516. This court in the early case of Burden v. Hornsby, 50 Mo. 238, sustained a judgment of damages for the killing of "Old Drum," mentioned, supra. Not only so, but we have made the dog a subject of grand larceny,

*Equity and Law.*

just the same as other property worth more than thirty dollars. [R. S. 1919, sec. 3312; R. S. 1909, sec. 4535; R. S. 1899, sec. 1898; R. S. 1889, sec. 3535.] So at least as early as Revised Statutes 1889, dogs have been classed as property, with a value.

In the instant case the plaintiff had complied with all the ordinance provisions for the redemption of "Black-and-Tan." Instead of having prepared in advance this bill in equity, and after Dieckman refused delivery of the dog, filing the same, he could have brought an action in replevin against Dieckman for the dog and gotten him. The dog was alive then from all accounts, but plaintiff preferred to try out a bill in equity with a dead dog as the moving cause, rather than take a simple legal remedy to recover the same. Of course the court of a justice of the peace is not quite so dignified as the equity side of a circuit court, but a writ of replevin in the hands of a constable, who might have deputized a corps of adept boy scouts, would have made the recovery of "Black-and-Tan" swift and certain. If the constable had been unable to catch "Black-and-Tan," the scouts would have been delighted with such a task.

Even after the unlawful demise of "Black-and-Tan" the master had his action of damages. If the master of "Old Drum" could recover in this court, why not the master of "Black-and-Tan"? Of course if there was collusion between the master of the dog and the pound-master to sacrifice "Black-and-Tan" for a test case (and there is a lurking suspicion of such) then the case might be different. But this to the side. Plaintiff had adequate and ample remedies at law, and the delicate machinery of a high court of equity should not be clogged with a simple dog case. That there are ample legal remedies for a case, such as we have, is not only apparent from the decisions of this State, but elsewhere. Even in Oklahoma, where domestic animals of the dog and cat line, are not as favorably considered as in Missouri and other states, it is recognized that the owners of such have full legal remedies to redress all wrongs against

such animals.   In Helsel v. Fletcher, 98 Okla. l. c. 286, it is said:

"The first question to be determined is that of whether or not a cat under the laws of this State constitutes property.   The general rule of law seems to be that all domestic animals are regarded as property, and that wild animals are not so regarded, except when captured and under the immediate dominion of some individual. Some writers distinguish between animals of real and intrinsic value for food, or beasts of burden, and animals that have no such value, but are kept to satisfy the mere whim or pleasure of the owner.   Among such animals we find cats; and many courts have held that animals of this nature are not subjects of larceny, except where specifically made so by statutory provisions, and we have no such statutes on cats, *but notwithstanding this fact the owner thereof may enforce his rights* therein by civil proceedings."

The same case is reported also in 33 A. L. R. 792, and this case is thoroughly annotated as to "Law as to Cats" at page 796 et seq., being an elaborate note to the principal case.   In the note it is pointed out that Blackstone (2 Blackstone, Com. 397) says that the killing of a cat was a grievous crime.   The annotator stops not with the question of a cat being property, but he sets out an old statute which fixed the measure of damages in civil action, thus:

"The foregoing statute is translated as follows in Ingham on Animals, p. 33, note: 'If anyone shall steal or kill a cat being the guardian of the King's granary, let the cat be hung up by the tip of its tail with its head touching the floor, and let grains of wheat be poured upon it until the extremity of its tail be covered with the wheat.'   The amount of wheat thus required to cover the tail apparently was the maximum recovery.   See also Thurston v. Carter (Me.) supra, for a mention of this law."

In this note will be found the "Cat Law" which is equally applicable to dogs.   Physically cats and dogs

should not be linked together, but the law classifies them in that way. The "Dog Law" of the country has been collated in a note to Graham v. Smith, from Georgia Supreme Court, 40 L. R. A. 503. On page 507 of 40 L. R. A. supra, will be found the case law of the country as to the legal actions maintainable where the subject of the action is a dog. The cases cover trover, replevin and trespass. They all show that this plaintiff had adequate legal remedies, and was thereby precluded from equity. This precludes a consideration of the ordinance in question. Had replevin been brought, and had the pound-master invoked this ordinance, in asserting his right to hold the dog, its validity might possibly have been determined in the legal action, but upon this question we do not now speak.

The judgment *nisi* is right, and it is affirmed. All concur, except *Atwood, J.*, not sitting.